UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NACM TAMPA, Inc., etc. *et al.,*

     Plaintiffs,

v.                    CASE NO.8:15-cv-1776-T-33TGW

SUNRAY NOTICES, INC.,
REACH TECHNOLOGY, LLC
*et al.,*

     Defendants.

## REPORT AND RECOMMENDATION

     The plaintiffs filed a Motion for Default Judgment (Doc. 85), seeking damages and injunctive relief against defendants Sunray Construction Notices, Inc., and Reach Technology, LLC, both of which failed to defend this case. The Clerk entered defaults against these defendants.

     The well-pled complaint allegations, which are unchallenged by the defendants, establish each defendant's liability on several claims, and the plaintiffs have presented evidence showing, within a reasonable certainty, their damages. I therefore recommend that default judgment be entered against Sunray Construction Notices, Inc., and Reach Technology, LLC, in

the amounts of $446,880 and $270,801.72, respectively, and that both defendants be enjoined from using the plaintiffs' Notice to Owner database.

I.

Plaintiff NACM Tampa (NACM) is an employee-owned National Credit Management Association (Doc. 1, ¶15). It created for its construction industry members a "Notice to Owner" (NTO) database (id., ¶16). Notices to Owners (NTOs) are used to create and preserve legal lien rights for contractors, materialmen and tradesmen (Joy Bodoh Dec., Doc. 86, ¶3).[1] NACM's NTO database contains information regarding construction projects throughout Florida and Georgia where it is necessary to issue NTOs (Doc. 1, ¶¶15, 16).

Plaintiff NACM Services, the sister company to NACM, conducts research in the NACM NTO database, prepares, and serves the NTOs ("full service NTO") (Doc. 1, ¶16; Doc. 86, ¶4). Alternatively, NACM offers a Do-it-Yourself (DIY) service where the customer is granted access

---

[1] The definition of "Notice to Owner" is further explained at www.nacmtampa.com. In short, "State of Florida law requires that anyone who supplies labor, services or material to a contractor on any job must send the [property] owner a 'Notice to Owner....' It ... informs the recipient that the company identified in the Notice to Owner is on a specific job and provides a general description of the ... materials ... or the type of work that they will be performing. Before paying a contractor, the property owner must make sure that the person who has given the Notice to Owner has been paid by the contractor."

to the NACM NTO database to conduct the research itself and create a Notice to Owner (using an NACM template), which NACM will mail to the appropriate parties (id.).[2]

Defendant Sunray Construction Notices, Inc. (Sunray Notices), provides the same services as NACM Services (see Doc. 1, ¶7). Defendant Reach Technology, LLC, is in the software development and installation business (id., ¶10).

The plaintiffs allege that the NACM NTO database was "created and is maintained at substantial effort and expense to NACM Tampa, and constitutes a significant asset to NACM Tampa" (id., ¶17). Specifically, it states that, "[o]ver the years, millions of dollars have been expended to create and maintain the NTO database" (Doc. 86, ¶6), and that NACM is "constantly collecting the necessary information and vetting its accuracy, for easy research and access in the preparation of NTOs" (id., ¶5).

The plaintiffs allege further that, "[t]o protect its investment in its Notice to Owner database, NACM Tampa operates the database with appropriate security measures designed to limit and control access only to

---

[2] As of July 2016, NACM charged $34 plus postage for each full-service NTO (Doc. 86, ¶4). For each DIY NTO, there is a base cost of $5.50, plus postage and other fees (id.). There is no indication that there is a fee for accessing NACM's NTO database.

NACM Services' subscribing clients, and then only on extremely limited and prescribed terms" (Doc. 1, ¶17).  Thus, before a client gains access to NACM's proprietary NTO database, the client must complete an Application/Agreement, in which it acknowledges that "NACM holds an interest in the Intellectual Property and Information provided in NACM's database," and agrees to maintain the confidentiality of the database (Doc. 1, ¶¶18(a), (b); see Doc. 1-1).

The client is also expressly prohibited from "provid[ing] any 'Notice to Owner' services to any third party unless Applicant has obtained NACM's prior consent" (Doc. 1, ¶18(d)).  Moreover, when a client logs into the NACM Notice to Owner database, the user must affirmatively accept that "Access to this data and utilization of passwords or codes to access such data is expressly limited to those persons to whom NACM has issued such passwords or codes, and use of such passwords or codes and/or access to the data by others is unauthorized and strictly prohibited" (id., ¶19).

As pertinent here, the complaint alleges that Sunray Notices and Sunray Construction Solutions, LLC (the Sunray companies), created unlawfully "proxy" client accounts to the NACM NTO database to enable them to conduct unauthorized research to service their NTO customers (Doc.

1, ¶¶23, 25, 36). Specifically, Ariella Owens, an owner of the Sunray

companies, states (Doc. 87, ¶¶2, 3):

> Sunray Notices noticed that a competitor,
> [plaintiff] NACM Services Corp.... had created a
> valuable database through which authorized
> NACM customers could research and prepare their
> Notices-to-Owners.... Instead of investing the large
> amount of time and expense that would be needed
> to develop its own database, Sunray Notices
> decided to gain surreptitious access to NACM's
> Notice-to-Owner database improperly for use with
> Sunray Notices' own business.

Owens explains that, in order to gain improper access to NACM's database

(id., ¶4):

> Sunray Notices used a proxy company called
> Monster Demolition that was meant to appear to be
> a valid customer of NACM. By using this proxy
> company, Sunray Notices knowingly gained
> unauthorized access to NACM's confidential
> Notice-to-Owner database to prepare Notice-to-
> Owners surreptitiously for Sunray Notices's own
> customers.

Additionally, the complaint alleges that defendant Reach

Technology was a proxy company through which Sunray Construction

Solutions (Sunray Solutions) surreptitiously conducted research in the NACM

NTO database for its customers (Doc. 1, ¶30). Owens elaborated (Doc. 87,

¶¶8-10):

In April 2014, as sole owner of Sunray Solutions, I entered into an arrangement with Defendant Reach Technology, LLC ("Reach")....

Although Reach had no need of which I was aware to file any Notices to Owner, I arranged with Reach to act as a proxy company for Sunray Solutions. As a result, Reach became a subscriber to the NACM Notice-to-Owner database....

Reach then knowingly gave Sunray Solutions access to Reach's NACM Notice-to-Owner account so Sunray Solutions could utilize Reach's NACM account to service Sunray Solutions' own customers.

In this regard, Reach Technology executed an "Application/Agreement for 'Do It Yourself' Notice to Owner Service," in which it agreed that (Doc. 1-1, ¶4):

NACM has and will have proprietary information (collectively "Information") which are valuable, special, and unique assets of NACM and need to be protected from improper disclosure. In consideration for the disclosure of the Information, Applicant [Reach Technology] agrees that Applicant will not at any time or in any manner, either directly or indirectly, use any Information for Applicant's own benefit, or divulge, disclose, or communicate in any manner any Information to any third party without prior written consent of NACM. Applicant will protect the Information and treat it as strictly confidential.

During the 2010-2011 time period, Sunray Notices processed 2,800-3,200 NTO transactions each month using NACM's NTO database (Doc. 87, ¶7). From April 2014 through July 2015, Sunray Solutions created for its clients 39,315 NTOs using Reach Technology's NACM NTO account (id., ¶11).

In July 2015, the plaintiffs filed a complaint against several defendants, alleging violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. 1961-65; Computer Fraud and Abuse Act, 18 U.S.C. 1030; Florida Deceptive and Unfair Practices Act, Fla. Stat. 501.201 et seq., and Florida Uniform Trade Secrets Act, Fla. Stat. 688.001 (Doc. 1). The complaint also alleges tortious interference with, and breach of, contract (id.).

In August 2015, the defaulting defendants were served with the summons and complaint (see Docs. 7, 11). Reach Technology failed to respond to the plaintiff's complaint as required by Rule 12, F.R.Civ.P. (see Docs. 21, 22). Consequently, the plaintiffs requested, and the Clerk entered a default, against Reach Technology (Doc. 23).

In September 2015, Sunray Notices filed an answer to the complaint (Doc. 29). In October 2015, its attorney moved to withdraw as

counsel due to irreconcilable differences (Doc. 43). The motion was unopposed by Sunray Notices and, in November 2015, Sunray Notices' counsel was permitted to withdraw (Doc. 46). In the Order of Withdrawal, the court stated that Sunray Notices had "thirty days to file a notice of appearance of new counsel. If no such notice is filed, a default against this corporation may occur because a corporation must be represented by counsel and cannot appear *pro se*. Local Rule 2.03(e)" (id.).

However, Sunray Notices did not file a notice of new counsel. The court, *sua sponte*, extended the time until January 5, 2016, to file a notice of appearance of new counsel, and warned that "[f]ailure to file said notice may result in Sunray Construction Notices, Inc.'s pleadings being stricken" (Doc. 47). In February 2016, no counsel appeared on behalf of Sunray Notices. Consequently, the court struck its pleadings (Doc. 49). Thereafter, the plaintiff requested, and the Clerk entered, a default against Sunray Notices (Docs. 50, 51).

As indicated, the plaintiffs have filed a Motion for Default Judgment against defendants Reach Technology and Sunray Construction Notices (Doc. 85). In support of their motion, they attach the declarations of Joy Bodoh, vice president of NTO operations for NACM Services, and

Ariella Owens, an owner of the Sunray companies (Docs. 86, 87). The plaintiffs seek damages against Sunray Notices of $1,787,520, and the sum of $1,354,008.50, against Reach Technology (Doc. 85, pp. 14-15). They also request a permanent injunction (id.).

The motion for default judgment was referred to me for a report and recommendation (Doc. 88). The plaintiffs were directed to supplement their motion on damages, which was based on the unsupported assumption that, but for the defendants' unlawful conduct, NACM Services would have serviced each of the NTOs created by the Sunray companies with the use of the NACM database (Doc. 89). The plaintiffs filed the supplemental memorandum (Doc. 91).

In September 2016, the court held oral argument on the motion for default judgment, at which time the court told the plaintiffs that they needed to further develop the legal and factual bases for some of their claims and, in particular, the RICO claim (see Doc. 93). Consequently, the report and recommendation was deferred pending the receipt of a second supplemental memorandum (id.).

In November 2016, the plaintiffs submitted a second supplemental memoranda (Doc. 96). In the second memorandum, the

plaintiffs narrow the claims upon which they seek a default. Specifically, "NACM has decided to focus solely on its counts relating to theft of trade secrets (Count IV), fraud (Counts II and III), and breach of contract (Counts VI and VII)" (id., p. 1). Accordingly, the report and recommendation will address only those claims. The plaintiffs also reduced the amount of the requested damages (id., p. 12).

The defendants were served with the motions for default judgment and the supplemental memoranda (see Docs. 85, p. 16; Doc. 91, p. 8; Doc. 96, p. 13). However, neither defendant responded to any of these filings, or otherwise attempted to challenge the plaintiffs' allegations.

## II.

A district court may enter a default judgment against a properly served defendant who fails to defend or otherwise appear pursuant to Rule 55(b)(2), F.R.Civ.P. DirecTV, Inc. v. Griffin, 290 F.Supp. 2d 1340, 1343 (M.D. Fla. 2003). By defaulting, the defendant is deemed to have "admit[ted] the plaintiff's well-pleaded allegations of fact" for purposes of liability. Buchanan v. Bowman, 820 F.2d 359, 361 (11th Cir. 1987). On the other hand, "[t]he defendant is not held to admit facts that are not well pleaded or to admit conclusions of law. In short ... a default is not treated as an absolute

confession by the defendant of his liability and of the plaintiff's right to recover." Nishimatsu Const. Co. v. Houston Nat. Bank, 515 F.2d 1200, 1206 (5th Cir. 1975).[3]

### III.

A.   Florida Uniform Trade Secrets Act

The plaintiffs allege that the defendants' conduct violated the Florida Uniform Trade Secrets Act (FUTSA). In order to establish a violation of FUTSA, the plaintiff must show that (1) it possessed secret information and took reasonable steps to protect its secrecy, and (2) the secret was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it. XTec, Inc. v. Hembree Consulting Servs., Inc., 183 F. Supp. 3d 1245, 1253 (S.D. Fla. 2016); Fla. Stat. 688.001. The plaintiffs' allegations state a FUTSA claim against the defaulting defendants.

---

[3]The standard for determining what constitutes a sufficient basis for a default judgment is akin to that necessary to survive a motion to dismiss for failure to state a claim. See Chudasama v. Mazda Motor Corp., 123 F.3d 1353, n.41 (11th Cir.1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim.). "Conceptually, then, a motion for default judgment is like a reverse motion to dismiss for failure to state a claim." Surtain v. Hamlin Terrace Found., 789 F.3d 1239, 1245 (11th Cir. 2015).

The plaintiffs allege that the NACM NTO database is a protectable trade secret under Fla. Stat. 688.002(4) (Doc. 1, ¶60). That subsection defines a trade secret to include a "compilation [of information] ... that: (a) Derives independent economic value ... from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use...."

While the plaintiffs acknowledge that some of the information in the database is available publicly, it asserts that the database's "value comes from the collection and distillation of this information for use online by [NACM's] customers" (Doc. 96, p. 2). See Unistar Corp. v. Child, 415 So.2d 733, 734 (Fla. App. 1982) (customer list is a trade secret where list was "a distillation" of a larger list and reflecting considerable effort, knowledge, time and expense on the part of the plaintiff).

In this regard, the plaintiffs state that "NACM has invested and continues to invest great effort and expense in creating and maintaining the accuracy of this database" (Doc. 85, p. 11; see Doc. 1, ¶17). Specifically, NACM states that it has spent millions of dollars creating and maintaining this database of information that allows its customers to conduct speedy and accurate research needed to create NTOs (Doc. 86, ¶6). As the plaintiffs aptly

point out, the best illustration of the value of NACM's NTO database is the defendants' efforts to gain access to the database surreptitiously.

Furthermore, NACM takes reasonable steps to protect the secrecy of the NTO database. Thus, the database is password-protected, and in order to obtain a password, the entity must complete an Application/Agreement in which it acknowledges the confidential and proprietary nature of the database, and agree to treat the data as strictly confidential and not use it for the benefit of third parties (Doc. 1, ¶¶18, 19, see Doc. 1-1). In sum, the well-pled allegations show that NACM's NTO database is a "trade secret."

Furthermore, the well-pled allegations of the complaint show that NACM's NTO database was misappropriated, and that it was done knowingly and willfully. The plaintiffs allege that the defendants "knowingly and intentionally misused accounts and passwords for NACM's confidential NTO database without authorization from NACM...."(Doc. 1, ¶¶35, 36). In this regard, they specify that Sunray Notices, purporting to be Monster Contracting & Engineering, applied for a subscription to NACM Services' Notice to Owner DIY program, and misused the account and password to gain access to the NACM Notice to Owner database to perform unauthorized

research for Sunray's clients (Doc. 1, ¶¶23, 25, 36; Doc. 87, ¶4). Furthermore, the plaintiffs allege that defendant Reach Technology became a subscriber to the NACM Notice to Owner database solely for the improper purpose of providing Sunray Construction Solutions unauthorized access to that database (Doc. 1, ¶¶30, 36; see also Doc. 87, ¶¶8-10). These actions clearly constitute misappropriation in violation of FUTSA. See Fla. Stat. 688.002(2) (misappropriation is the acquisition of a trade secret of another by improper means, and the disclosure or use of a trade secret of another without express or implied consent).

As indicated, neither defendant has made any attempt to challenge any of the plaintiffs' allegations. To the contrary, Ariella Owens, an owner of defendant Sunray companies, admits to the wrongdoing (see Doc. 87). In sum, the plaintiffs established that the defaulting defendants are liable for violating FUTSA.

### B. Computer Fraud and Abuse Act

The plaintiffs also allege that the defendants violated the Computer Fraud and Abuse Act (CFAA) (Doc. 1, ¶¶49-52). To show a violation of the CFAA, "the plaintiff must prove the amount of loss, plus the elements of the particular subsection of the CFAA under which the plaintiff

brings suit." Thomas Christopher Grp., Inc. v. Moreno, 2015 WL 4139169, at *3 (M.D. Fla. July 8, 2015).

It has been noted that "the CFAA is anything but a well-settled area of law" and courts have "adopted significantly different interpretations of this act." Workgroup Technology Partners, Inc. v. Anthem, Inc., 2016 WL 424960 at *23 (D. Me. February 3, 2016). However, there is legal authority which supports the sufficiency of the plaintiffs' allegations that the defendants violated the CFAA.

Initially, it is noted that violations of the CFAA require the use of a "protected computer" or conduct that "affects interstate or foreign commerce." A protected computer is a computer that is used in, or affecting, interstate or foreign commerce or communication. 18 U.S.C. 1030(e)(2)(B).[4] The plaintiffs allege that the NACM NTO "database constitutes a 'protected computer' ... because NACM provides access over the Internet to subscribers [of] its confidential database who are located in both Florida and Georgia" (Doc. 1, ¶49). The Internet is an interstate communication system and, therefore, the database is appropriately considered a "protected computer."

---

[4] The term "computer" includes a "high speed data processing device" and "any data storage facility or communications facility directly related to or operating in conjunction with such device" 18 U.S.C. 1030(e)(1).

See United States v. Trotter, 478 F.3d 918, 921, (8th Cir. 2007) ("With a connection to the Internet, the ... computers were part of a system that is inexorably intertwined with interstate commerce..."); T-Mobile USA, Inc. v. Terry, 862 F.Supp.2d 1121, 1130 (W.D. Wash. 2012) (the plaintiff's telecommunications network is a protected computer as defined in 18 U.S.C. 1030(e)(2)).

The plaintiffs allege that the defendants violated three subsections of the CFAA (Doc. 1, ¶¶49-52). Section 1030(a)(2)(c) of the CFAA prohibits a person from intentionally accessing a computer without, or in excess of, authorized access, and thereby obtaining information from any protected computer. The plaintiffs allege that the defendants violated this subsection "by intentionally accessing NACM's confidential Notice to Owner database without authorization and/or in excess of authorized access and thereby obtaining construction job information from the database" (Doc. 1, ¶50).

The plaintiffs allege sufficiently that the defendants exceeded their authority to access the NACM NTO database because, as discussed supra, pp. 3-4, the plaintiffs expressly prohibited the manner in which the defendants used the database. See 18 U.S.C. 1030(e)(6) ("the term 'exceeds

-16-

authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled to obtain or alter");[5] see EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 583 (1st Cir. 2001) (a former employee who "mine[d]" his former employer's publically accessible website for information that he provided to a competitor, in violation of a confidentiality agreement, stated a CFAA claim).

The plaintiffs next allege a violation of §1030(a)(4) of the CFAA. It provides that, "[w]hoever ... knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period," violates the CFAA. The plaintiff alleges sufficiently that the defendants violated this subsection because they knowingly, and with intent to defraud NACM, accessed the NACM NTO

---

[5]The statute does not define "access." The dictionary definition of the word "access" includes "the right or opportunity to reach or visit; admittance." Oxford Dictionary and Thesaurus, Am. Ed., Oxford Press, 1996. Thus, Sunray Notices was also without authorization to access the NACM NTO database.

database in order to obtain information to service Sunray companies' clients, the value of which amounted to much greater than $5,000 each year (Doc. 1, ¶51).

Finally, the plaintiffs allege the violation of 1030(a)(6)(A) of the CFAA, which prohibits anyone who "knowingly, and with intent to defraud, traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if ... such trafficking affects interstate or foreign commerce." The term "traffic" means transfer, or otherwise dispose of, to another, or obtain control of with intent to transfer or dispose of." 18 U.S.C. 1029(e)(5).

The plaintiffs allege that the defendants "knowingly and with intent to defraud NACM trafficked in accounts and passwords through which the NACM confidential Notice to Owner database was accessed without authorization affecting interstate commerce" (Doc. 1, ¶52). Although Reach Technology clearly trafficked in NACM account and password information by giving that information to Sunray Solutions, the complaint does not contain facts indicating that Sunray Notices obtained the NACM password information with the "intent to transfer or dispose of" it.

In sum, the plaintiffs' unchallenged factual allegations are sufficient to state violations of the CFAA. Specifically, by the defendants' default, the plaintiffs have established that Sunray Notices is liable for violations of §1030(a)(2)( c) and §1030(a)(4), and that Reach Technology is liable for violations of those sections and §1030(a)(6)(A).

### C. Florida Deceptive and Unfair Practices Act

The plaintiffs also allege that Sunray Notices violated the Florida Deceptive and Unfair Practices Act, Fla. Stat. 501.201 *et. seq.* (FDUPTA). In order to prove a FDUTPA violation, the plaintiffs must establish: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. Kenneth F. Hackett & Assocs., Inc. v. GE Capital Info. Tech. Sols., Inc., 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010). A practice is unfair if it "offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So.2d 773, 777 (Fla. 2003).

Although FDUPTA is commonly recognized as a statute used to protect consumers, the plaintiffs point out that it also expressly protects "legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the

-19-

conduct of any trade or commerce." Fla. Stat. 501.202; see Aceto Corp. v.

TherapeuticsMD, Inc., 953 F. Supp. 2d 1269, 1287 (S.D. Fla. 2013) (because

the statute on its face states it is to protect legitimate business enterprises, the

plaintiff company has standing under the Act); see, e.g., Furmanite Am., Inc.

v. T.D. Williamson, Inc., 506 F.Supp.2d 1134, 1146-47 (M.D. Fla. 2007)

(plaintiff has standing to bring FDUTPA claim for damages against the

defendant, a competitor, for the misappropriation of trade secrets and

confidential information).

The plaintiffs allege that Sunray Notices committed deceptive

and unfair acts by, among other things (Doc. 1, ¶56):

> (a) using proxy companies to gain unauthorized
> access to the NACM Notice to Owner database; (b)
> using unauthorized access to the NACM Notice to
> Owner database to conduct research to create
> documentation for [its] Notice to Owner clients...
> (c) unfairly competing with NACM Services in the
> field of offering Notice to Owner documentation
> through gaining unauthorized access to the NACM
> Notice to Owner database....

The plaintiffs allege that they were damaged by this deceptive conduct

because, instead of earning revenue for these NTO transactions, they earned

nothing (Doc. 96, p. 11). Furthermore, they lost customers due to the lower

prices Sunray Notices could offer by improperly using the NACM NTO

database for free.  These unchallenged allegations state a claim for violating FDUPTA.  Accordingly, the plaintiffs are entitled to judgment against Sunray Notices as to liability on their FDUPTA claim.

### E.  Breach of Contract

Finally, the plaintiffs allege against both defendants breach of contract.  In order to establish liability for breach of contract, Florida law requires the plaintiff to show (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach.  Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1272 (11th Cir. 2009).

The plaintiffs allege that, "[e]ach time one of the Defendants logged in to the NACM Notice to Owner database, the Defendants were required to agree (by clicking "I agree") that they were authorized users of the NACM Notice to Owner database and they would not permit unauthorized access by others" (Doc. 1, ¶76).  The plaintiffs allege further that the defendants "breached this agreement ... by either being an unauthorized user of the NACM Notice to Owner database or allowing access to an unauthorized user" (id., ¶78).

Additionally, the plaintiffs allege that Reach Technologies breached its written agreement with NACM by, among other things, using

-21-

NACM's proprietary information for Reach's benefit; failing to protect NACM's proprietary information as strictly confidential; and disclosing NACM's proprietary information to third parties without NACM's consent (Doc. 1, ¶¶83-85). All of these actions are expressly prohibited under the terms of the written agreement with NACM (see Doc. 1-1). Accordingly, the well-pled and unchallenged factual allegations show the existence of agreements between the plaintiffs and defendants, which each defendant violated, thereby resulting in damage to the plaintiffs.

In sum, based on the defendants' defaults, the plaintiffs are entitled to judgment as to liability on their FUTSA, CFAA, FDUPTA, and breach of contract claims.

IV.

The plaintiffs allege that, as a result of the defendants' unlawful conduct, they sustained millions of dollars in damages (Docs. 85, 96). "Although a defaulted defendant admits well-pleaded allegations of liability, allegations relating to the amount of damages are not admitted by virtue of default. Rather, the Court determines the amount and character of damages to be awarded." Miller v. Paradise of Port Richey, Inc., 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999).

The plaintiffs seek as damages an award of their lost profits (Docs. 85, 96). In this regard, the Eleventh Circuit has stated (Nebula Glass Int'l, Inc. v. Reichhold, Inc., 454 F.3d 1203, 1217 (11th Cir. 2006)):

> In lost profit cases, Florida's courts have clearly held that once causation is proven with reasonable certainty, uncertainty as to the precise amount of the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages. As the Florida Supreme Court in W.W. Gay explained, "the uncertainty which defeats recovery in such cases' is the cause of the damage rather than the amount. If from proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial person." 545 So.2d at 1350-51 (quoting Twyman, 166 So. at 218). Thus, lost profit damages are recoverable if there is some standard by which the amount of damages may be adequately determined. W.W. Gay, 545 So.2d at 1350-51....

Therefore, "while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." G.M. Brod & Co. v. U.S. Home Corp., 759 F.2d 1526, 1539 (11th Cir. 1985).

The plaintiffs request pursuant to FUTSA damages of $1,443,456 against Sunray Notices, and $879,083.40 against Reach

Technology (Doc. 96, p. 8). These sums represent the plaintiffs' alleged lost profits, plus an equal amount in exemplary damages for the defendants' willful and malicious misappropriation of the NACM NTO database.

Damages authorized under FUTSA include: (1) "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss" and, (2) if "willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (1)." Fla. Stat. 688.004.

The plaintiffs base their alleged lost profits on the number of NTOs the defendants serviced using NACM's NTO database, multiplied by the plaintiffs' profit per DIY (do-it-yourself) NTO (see Doc. 92). The plaintiffs estimate that Sunray Notices serviced approximately 67,200 NTOs using the NACM NTO database during the relevant time period (Doc. 96, p.7). This estimate is supported by the declaration of Ariella Owens who avers that, during the period of January 2010 until September 2011, Sunray Notices serviced between 58,800 and 67,200 NTOs using NACM's NTO database (see Doc. 87, ¶7).

The plaintiffs argue, reasonably enough, that the higher estimate of 67,200 should be accepted as the number of NTOs serviced by Sunray Notices with use of the NACM NTO database. This figure is unchallenged by Sunray Notices and, notably, it is only a fraction of the NTOs Sunray Notices improperly serviced with the NACM NTO database, as its misuse of the database dates back to 2007 (see Doc. 87, ¶4).

Furthermore, Owens' declaration also provides evidence that, from April 2014 through July 2015, Sunray Solutions serviced 39,315 NTOs using Reach Technology's credentials to improperly access the NACM NTO database (Doc. 96, p. 7; Doc. 87, ¶11).

However, the plaintiffs' use of these figures as the basis for their lost profits is problematic. Thus, the number of NTOs created by the defendants with the use of NACM's database is distinct from the number of NTOs the plaintiffs would have serviced but for the defendants' misappropriation of that database. It is the latter number which appropriately determines lost profits because there is no evidence that NACM charged for use of its database apart from the fees for the NTOs. See Aldon Industries, Inc. v. Don Myers & Associates, Inc., 517 F.2d 188, 191 (5th Cir. 1975) (damages are "the natural and proximate result of [the defendants'] alleged

wrongful conduct"); Sihle Ins. Grp., Inc. v. Right Way Hauling, Inc., 845 So.2d 998, 1001 (Fla. App. 2003) ("Lost profits must be with reasonable certainty and be ... a natural consequence of the wrong.").

The plaintiffs contend that, since "the [Sunray companies'] customers' accounts were serviced using NACM's NTO database, it is reasonable to credit Plaintiffs with their expected profits off of all of these NTO sales" (Doc. 91, p. 3). This argument conflates unjust enrichment and lost profits damages. Thus, if the plaintiffs' damages were premised on unjust enrichment, they would arguably be entitled to the defendants' profits for each NTO. However, the plaintiffs are seeking damages for each NTO based on the plaintiffs' profits per NTO (see id., pp. 3-4). That requires the court to infer that, but for the defendants' misappropriation, NACM Services would have been selected to service every one of those NTOs created by the defendants with the use of the NACM NTO database. The plaintiffs provide no reasonable basis for such an inference. See Brough v. Imperial Sterling Ltd., 297 F.3d 1172, 1177 (11th Cir. 2002) ("damages may not be awarded for lost profits when those profits are dependent on a party taking an action that it is unclear he would have taken"); Nebula Glass Int'l, Inc. v. Reichhold, Inc., supra, 454 F.3d at 1213 (11th Cir. 2006) ("It is settled under Florida law

that lost profit damages, like all damages, cannot be speculative and must be proved with reasonable certainty.").

On the other hand, the plaintiffs propose an alternative method of computing lost profits based on market share that is reasonable (Doc. 91, pp. 6-7). See Premier Lab Supply, Inc. v. Chemplex Indus., Inc., 94 So.3d 640, 645 (Fla. Dist. Ct. App. 2012) ("lost profits based on a market share is an acceptable approach of demonstrating the causal relationship between misappropriation and lost profits").

The plaintiffs present evidence that NACM Services' market share of NTOs in Florida was 40% in 2010-2011, and 25-30% in 2014-15 (Doc. 92, ¶¶3, 4). The plaintiffs contend that it is reasonable to increase the estimated market share to 50% for 2010-11, and 40% for 2014-2015 because these figures are artificially low (see Doc. 91, pp. 6-7). In this regard, the plaintiffs assert that they are "aware that certain of its customers, including significant portions of major accounts, switched from NACM Services Corp. to Defendants for NTO services because Defendants were able to offer lower prices as a result of their improper activities" (Doc. 91, p. 6; see Doc. 86, ¶8; Doc. 92, ¶5). Therefore, NACM argues, "[b]ecause these customers likely would have remained with NACM Services Corp. absent Defendants'

[mis]conduct, it is appropriate to credit NACM Services Corp. with a higher percentage of Defendants' sales than that indicated by NACM Services Corp.'s overall market share" (Doc. 91, p. 6).

It is reasonable to credit the plaintiffs with the requested larger market shares, especially considering the evidence that "[t]here are a very limited number of competitors in the Florida NTO service market," three of which are defendants in this case (Doc. 86, ¶8). See ABC-Paramount Records, Inc. v. Topps Record Distrib. Co., 374 F.2d 455, 461 (5th Cir. 1967) (quoting Restatement, Torts 912, Comment d (1939)) ("it is not fatal to the recovery of substantial damages that [the plaintiff] is unable to prove with definiteness the amount of profits he would have made.... It is only essential that he present such evidence as might reasonably be expected to be available under the circumstances."). Moreover, although estimates are involved, neither defendant challenges their reasonableness.

Therefore, based on the plaintiffs' market share computations, the plaintiffs are reasonably credited with 33,600 NTOs during the 2010-2011 time period (50% of the 67,200 NTOs), and 15,726 NTOs during the 2014-2015 time period (40% of the 39,315 NTOs).

The second element of the lost profits calculation is the plaintiffs' profit per NTO. NACM Services' vice president, Joy Bodoh, examined the NTO revenues and, after subtracting NTO-related expenses, she estimates its profit per NTO as follows (Doc. 86, ¶¶10-14; Doc. 92, ¶¶13-14):

2010-2011:[6]

full service NTO: $6.65
DIY NTO: $10.74


2014-2015:

full service NTO: $8.61
DIY NTO: $11.18


The plaintiffs initially sought damages based on their profit per "full service" NTO (see Doc. 86, ¶¶13, 14). They now request the court to calculate their lost profits based on its higher-profit "DIY" NTO service (Doc. 91, p. 4; Doc. 96, p. 5).[7] The plaintiffs argue they should be credited with DIY NTO profits because "[t]he improper conduct by the defendants is more

---

[6]The estimated profit per NTO in 2010-2011 was based on figures from 2013, which is the earliest information available (Doc. 86, ¶13).

[7]Although the full-service NTO costs more, NACM Services' DIY NTO is more profitable because, among other factors, there are lower labor costs attendant to the DIY service (Doc. 96, p. 6, n.1; Doc. 92, ¶¶6, 9).
The plaintiffs had no authorization to include in their supplemental memoranda this upward revision of their alleged damages (see Doc. 89).

akin to this second type of NTO servicing by NACM" (Doc. 96, p. 5). However, the plaintiffs' lost profit depends upon whether the clients they would have had but for the defendants' misappropriation would have purchased full, or DIY, service. In other words, the manner in which the defendants used the NACM NTO database is irrelevant to whether the clients would have selected NACM's DIY NTO service.

The plaintiffs have not presented a reasonable basis to conclude that all, or even a significant number, of those clients would have selected the DIY NTO service. See Nebula Glass Int'l, Inc. v. Reichhold, Inc., supra, 454 F.3d at 1213-14 ("It is settled under Florida law that lost profit damages, like all damages, cannot be speculative and must be proved with reasonable certainty."); Brough v. Imperial Sterling Ltd., supra, 297 F.3d at 1177 ("The mind of a prudent impartial person should be satisfied that the damages are not the result of speculation or conjecture.").

To the contrary, the customers at issue ostensibly hired the Sunray companies to provide full-service NTOs (see Doc. 96, p. 5 ("the defendants used the NACM NTO database to research and then create the NTOs in question")). Furthermore, the plaintiffs admit that "[m]ost often [it] provides 'full' NTO services" (Doc. 91, p. 3). Therefore, a more accurate

estimate of the plaintiffs' lost profits in this instance is the profit per "full service" NTO. Accordingly, the lost profits estimate is premised upon a lost profit per full-service NTO of $6.65 in 2010-2011, and $8.61 in 2014-2015.

This amounts to lost profits of $223,440, attributable to Sunray Notices, Inc.; and $135,400.86, attributable to Reach Technology, Inc. The lost profits calculations, determined within a reasonable certainty, are as follows:

2010-2011:

67,200 estimated NTOs serviced by Sunray Notices using NACM database
50% estimated market share
=33,600 NTOs credited to NACM
x $6.65 profit per full-service NTO
_____
$223,440 lost profit caused by Sunray Notices


2014-2015:
39,315 NTOs serviced using NACM database with Reach Technology's credentials
40% market share (estimated)
=15,726 NTOs credited to NACM
x $8.61 profit per full-service NTO
_____
$135,400.86 lost profit caused by Reach Technology

Moreover, the plaintiffs request the court to double the damage award for the defendants' willful and malicious wrongdoing (Doc. 96, p. 8).

See Fla. Stat. §688.004(2) (permitting damages in an amount not exceeding twice the award for malicious and willful misappropriation).   This enhancement is warranted because the defendants admitted, through their default, factual allegations that support findings of willful and malicious misappropriation (see supra, pp. 4-6).   Accordingly, I recommend that judgment be entered against Sunray Notices, Inc., for damages totaling **$446,880** ($223,440 x 2), and damages against Reach Technology, LLC, in the sum of **$270,801.72** ($135,400.86 x 2).

Other claims

The plaintiffs' sole theory of recovery for their other claims is lost profits (see Doc. 96, pp. 9, 11, 12).  Lost profits are compensable under the other statutes, see 18 U.S.C. 1030(g), Fla. Stat. 501.211(2), and for breach of contract.  However, the plaintiffs are receiving their lost profits from the defendants pursuant to FUTSA. An award of the same element of damages under another claim is impermissibly duplicative.  See Atlantic Coast Line R. Co. v. Saffold, 178 So. 288, 290 (1938) (a double recovery based on the same element of damages is prohibited).   Therefore, no additional damages are warranted.

Permanent Injunction

The plaintiffs also request that the defendants be "permanently enjoined from misappropriation of NACM TAMPA'S trade secrets through unauthorized access to NACM TAMPA's Notice to Owner database...." (Doc. 85, p. 15). See Fla. Stat. 688.003(1) (authorizing the entry of an injunction for "[a]ctual or threatened misappropriation").

A plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. See Angel Flight of Ga., Inc. v. Angel Flight America, Inc., 522 F.3d 1200, 1208 (11th Cir. 2008).

"Under Florida law, 'irreparable harm and inadequate remedy at law should be presumed in an action for injunctive relief with respect to the misappropriation of a trade secret.'" Aquent LLC v. Stapleton, 2014 WL 117095, at *3 (M.D. Fla. Jan. 13, 2014) (quoting Dotolo v. Schouten, 426 So.2d 1013, 1015 (Fla. App. 1983)). The plaintiffs' uncontroverted allegations show that the defendants' misappropriation of the NACM NTO

database has harmed their business, and presents a threat of future harm. The defendants, by their default, do not make any attempt to overcome this presumption.

The last two factors, the balance of hardships between the plaintiffs and defendants, and the public interest, clearly favor the entry of a permanent injunction. Thus, neither defendant has presented any basis upon which to conclude that the balance of hardships favors either one of them. Moreover, the entry of a permanent injunction under these circumstances supports the public interest because businesses would be discouraged from making significant investments in the creation of databases if there was inadequate legal protection against misappropriation by competitors. See Hatfield v. AutoNation, Inc., 939 So.2d 155, 158 (Fla. App. 2006) (Florida's public policy favors the protection of businesses and their trade secrets. "[T]he existence of Florida's trade secret statute illustrates our state's interest in protecting businesses from theft of confidential information."). Accordingly, I recommend the entry of a permanent injunction against the defendants.

V.

For the foregoing reasons, I recommend that the plaintiffs'
Motion for Default Judgment (Doc. 85) be granted to the extent that final
judgment be entered in favor of the plaintiffs, and against the defendants, for
violations of the Florida Uniform Trade Secrets Act; the Computer Fraud and
Abuse Act; breach of contract; and, as to Sunray Notices only, the Florida
Deceptive and Unfair Practices Act. I recommend further that the plaintiffs
be awarded damages of **$446,880** against defendant Sunray Construction
Notices, Inc., and damages totaling **$270,801.72** against defendant Reach
Technology, Inc., and the entry of a permanent injunction.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: FEBRUARY _8_ , 2017

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections
to the Report and Recommendation's factual findings and legal conclusions.
A party's failure to file written objections waives that party's right to
challenge on appeal any unobjected-to factual finding or legal conclusion the
district judge adopts from the Report and Recommendation. 11th Cir. R. 3-1.